**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| **upon the relation and for the use of the** | ) |
| **TENNESSEE VALLEY AUTHORITY** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )    **NO. 3:11-cv-0311** |
| **AN EASEMENT AND RIGHT OF WAY** | )    **Judge Wiseman** |
| **OVER 2.49 ACRES OF LAND MORE OR** | ) |
| **LESS, IN SUMNER COUNTY, TENNESSEE** | ) |
| | ) |
| **MARY KATHERINE LORANCE, SUMNER** | ) |
| **BANK & TRUST and RICHARD** | ) |
| **HUTCHINSON,** | ) |
| **Defendants.** | ) |

**REPORT OF THE COMMISSION**

     This Commission appointed pursuant to Administrative Order number 75 of this court and Rule 71A (h) of the Federal Rules of Civil Procedure to determine the issue of just compensation for the taking of the property herein condemned files the following report.

**HISTORY OF THE CASE**

     1.    The notice and complaint, with property description, were filed April 1, 2011. The order of possession, investment order and the order appointing commissioners were entered April 6, 2011.  The date of taking of this case was April 1, 2011.

     2.     On December 4, 2012, the Commission met with the parties, their counsel and expert witnesses for a view of the property.

     3.    The trial of this matter commenced on December 6, 2012 at 9:00 A.M. and was concluded on December 7, 2012, in Courtroom 783, United States District Courthouse, 801 Broadway, Nashville, TN 37203.

4.     The property taken is described in the Declaration of Taking (Docket No. 1-1) and the attached property description, as well as in Exhibit 1, the Plan and Profile Map.  Exhibit 1 also includes an attachment designated as Document No. 29-2- Revised Tract Drawing for TVA, drawing LW-8707-sheet P5.  (Exhibit 1 will referred to hereinafter simply as "the Plans.")

5.     The taking comprises a 2.49 acre easement and rights for guy wires outside of the easement area.  At the view it appeared there were guy wires running from one pole, specifically pole No. 152 at station 755 + 18.25, as shown on the Plans.  There are no other poles on the property.  The pole's location is denoted in the Plans and on the aerial photo, Exhibit 2.

6.     On October 25, 2012, an Agreed Order (Docket 29) was entered, adjusting the description of the easement and right-of-way, amending the case caption, and ordering that $6,500.00 be included in the award of just compensation for any claims that the landowner "may have asserted in connection with the adjustment made to the easement and right-of-way as a result of the order."   The adjustment will be made at the end of the Report.

7.   Exhibit 1., which is a full size copy of  the Plan and Profile Map, including as an attachment Document No. 29-2- Revised Tract Drawing for TVA, drawing LW-8707-sheet P5 (specifically the area of the Lorance property easement) describes the underlying easement the power lines, the topography of the land and the types of pole and structures which are on the easements described.

8.   The following facts were stipulated:

a.   The size of the taking is 2.49 acres.

b.   The date of taking was April 1, 2011.

c.   The size of the entire Lorance property is 34.75 acres.

d. When appraisal reports used April 6, 2011 as the date of take there was no difference in value from April 1, 2011.

9. Exhibits admitted at the hearing were as follows:  Trans. Page No.

No. 1 - Plan and profile map  4

No. 2 - Aerial map  4

No. 3 - Photographs, house remodeling  16

No. 4 - Summary/itemization of remodeling expense  18

No. 5A through E - Photographs of the property  24

No. 6 - Aerial photograph  28

No. 7A through D - Photograph, west side of the property  30

No. 8 - Photographs of landowner's boundary line after condemnation  31

No. 9 - Summary of Ms. Lorance's testimony of the
damage to her property  40

No. 10 - Warranty deed (Galloway to Lorance)  53

No. 11 - Rock Creek Farm Web site printout  74

No. 12 - Comment section from the Rock Creek Farm Web
site  83

No. 13 - Report, Russell Edwin Parrish  102

No. 14 - CRS writeup and photographs and tax care and deed for Dry
Fork Creek Road,
Parcel 083 020.02  148

No. 15 - CRS writeup and photographs and tax card and deed for the
property Dry Fork Creek Road,
Parcel 083 020.00  148

No. 16 - Warranty Deed, Lot 11, Parcel 36.00  153

No. 17 - Report on Parcel 082 026.19                               164

No. 18 - Report, Martin Shaw                                       204

No. 19 - Supplemental Report, Martin Shaw                          204

E X H I B I T S Volume 2

No.
      20   - Photograph, tree pile                                              255

No.
      21   - Aerial photograph, septic field lines                             278

No.  22   - Appraisal of Gary Standifer, MAI,            CCIM               291

No.  23   - Appraisal of Gary Standifer, MAI, Addenda (for   CCIM,
             identification)                                                 291

No.  24   - Appraisal of Gary Standifer, MAI, Studies (for   CCIM,          291
             identification)
                                                                             343

No.  25   - Warranty deed, Parcel 82 026.00
                                                                             343

No.  26   - Warranty deed, Parcel 802 01.150

10.     This case involves the acquisition of an easement and right of way (hereinafter "the easement") on 2.49 acres more or less, plus guy wire rights, in Sumner County, Tennessee. The total size of the tract from which the easement is taken, as stipulated, is approximately 34.75 +/- acres (hereinafter "the property").

11.     The Commission viewed and walked over a large area of the property and inspected both the property and the improvements, including a single family home. The land taken in the easement is dedicated by the Tennessee Valley Authority as tract number GATN-94 on the Gallatin-Angeltown Transmission Line. It is located between points 747+99.1 and 762+69.97.      The commission noted that the easement crosses the southwest corner of the property and has an angle within the property at station 755+18.25, which is the location of Pole

152 to which guy wires have been attached. At the time of the hearing the poles, transmission lines and guy wires had been constructed.

12.      The power line has one 161,000 volt circuit of three wires with two aerial ground wires above it. There is one H-4 pole structure on the property, which is one hundred six feet (106') tall and offset 7.5 feet from the centerline, with concrete backfill. (*See* Ex. 1.) There are four guy wires going from the single pole structure, which occupy a total of approximately .01 acre outside of the right of way. (*See, e.g.* Exhibit 22, Standifer Report, p. 22.)

13.      There is a 1.82 acre area southwest of the easement and the property's southwest corner. This 1.82 acre area is within a flood plain.

14.      At the outset of the hearing, the Commission noted that the defendant, Mary Catherine Lorance (hereinafter "the landowner") had filed a motion in limine seeking to exclude the expert report of Mr. Standifer and the studies attached, Exhibits 22, 23, and 24. After discussion the parties agreed to allow the Commission to hear the testimony and view the exhibits and take the motion in limine under advisement pending the testimony which would also be considered in the nature of a voir dire as to expertise and admissibility.

## EVIDENCE PRESENTED AT THE HEARING

### LANDOWNER TESTIMONY

15.      The landowner testified that she has lived on the property since 2009. She has made very substantial renovations to the house. The renovations were essentially complete as of the date of taking. Exhibit 4 is an itemization of the landowner's remodeling expenses. They total $526,635.08.

16.     The landowner opined that as of the date of taking her land was worth $10,000 an acre and the house $800,000.00. She opined that there was a ninety percent (90%) diminution in value of the land within the easement itself, which she valued at $22,410.00.

17.     The landowner testified that she had lost grazing area and shelter trees for cattle. She testified further that an extra fence was now required to prevent the cattle from getting to the southwest corner of the property.  Exhibit 6 illustrates this problem.[1]

18.     The landowner testified that she had sustained loss of view because of the loss of trees which were now "totally gone."  She testified further that she now had an undesirable view of her neighbor and could hear her neighbor's activities, which was not the case before the taking.

19.     The landowner stated that the easement goes north along the west boundary to a point slightly behind her house. She indicated that Collective Exhibit 8 showed the loss of trees during construction activity and how trees had been piled up. She testified that TVA's proposed plan to cure the loss of trees would not help the property and might damage it, especially its use for hay for her horses. She did not think that this plan cured the loss of view.  She stated that, regardless of the trees that were planted, the power line would still be visible when one pulled into the driveway. The cure would not cure the view from the road.

20.     The landowner testified that in her opinion the remainder of her property had been damaged ten percent (10%) from the construction of the TVA lines and structures.  Exhibit 9 is a summary of her opinion of the damage to her property. She is also concerned about the humming noise from the electricity flowing through the lines and is of the opinion that this would lessen the value of her house. The landowner is concerned about the difficulty and possible danger of

---

[1] There was discussion among counsel as to whether this was construction damage and thus not an issue the Commission could consider. The Commission will address this issue below.

mowing around the guy wires. The easement is one hundred feet wide and gradually thins as it crosses onto her neighbor. The view to the west side of her house is affected because of loss of trees. Access to a small corner of her property is made more difficult because of the easement.

21.     It was stipulated that the house on the property was originally built in 1988. Because of the landowner's remodeling, she is of the opinion that it is for all intents and purposes a fairly new house now.

22.     On cross examination, the landowner testified that she had purchased the property in May of 2008.  She began renovations soon after buying it. These renovation expenses totaled $526,635.08, as noted in Exhibit 4. Replacement value of her home is in her opinion $800,000. The foundation of the house remained the same.

23.     The landowner does not know how many trees were removed. The fence around newly seeded parts of the property can be taken down since stumps have been removed. The landowner and TVA agreed to put up the fence.

24.     Most of the trees the landowner complains of having lost were in a thick area close to the road. There was a large oak tree that was cut. This can be seen in the pictures in collective exhibit 5A-E and exhibit 8  She does not believe that the proposed planting of trees benefits her property. She has planted trees to the west to lessen the view of the power line.

25.     The landowner's opinion of ten percent (10%) damage is not from looking at sales. The landowner conducts a wedding business out of her home, making the home and grounds available for weddings.  The website for her wedding business website displays pictures both with and without the power line. She does not mention the power lines on her website, even though the site was created after the construction of the lines and pole.  Customer comments posted to the website state how beautiful the property is. *See* Exhibit 11. (Counsel for TVA

objected to the introduction of the comments on the web-site as hearsay. The Commission overruled the objection, holding that it could consider the statements on the web-site and the comments themselves, although the latter would not be considered for the truth of the matter asserted.)

26.     On examination by the Commission, the landowner testified that she had paid more to remodel the house than she would have to buy it as it is now. She was of the opinion that the power lines limit the number of potential buyers who would be interested in the property. Many trees that were cut were boundary line trees. The landowner considered her own expert's report and her emotions in her ten percent (10%) damage figure. Her damage assessment is based on loss of serenity and view and the obstruction of the power line.

**RUSSELL PARRISH, LANDOWNER EXPERT**

27.     The landowner next called Russell Parrish as an expert appraiser. It was stipulated that he was an expert who could express opinions as to value. Mr. Parrish inspected the property and noted that the scenery and view was a "major asset of the property as a whole." He saw the property in the before condition and after construction of the lines.

28.     Mr. Parrish prepared an expert report, which was introduced into evidence as Exhibit 13. In the report, he made use of the comparable sales method of evaluation. He searched and relied upon three comparable sales: 1. Howard to Martin, in which 11.52 acres were sold on February 29, 2008, for $123,500 or $8,550 per acre (after removing the improvements value); 2. Scott to Kingrey, in which 10.18 acres were sold September 19, 2008, for $115,000 or $10.609 per acre (after removing the improvements value); and 3. Witucki to Helms, in which 22.58 acres were sold February 15, 2011, for $138,000 or $8,813 per acre.

These properties were .34 miles west; .55 miles southeast; and 1.58 miles southwest of the subject property respectively. *See* Exhibit 13, Parrish report at pp. 33 through 37.

29.     Mr. Parrish described the land as slightly rolling 34.75 acres with good road frontage of 1,080 feet. The location of the house was an asset. None of the comparable sales he selected had as much road frontage as the subject property. He made an adjustment to the comparables for road frontage. He was of the opinion that the physical proximity or closeness of the comparable sales was very important. He thought it was unique to have three comparables this close in the current market.

30.     Mr. Parrish testified to the economic downturn at the end of 2007 and the start of 2008. He was of the opinion that the market was picking up, as of the date of taking, but not to a significant degree. For comparability, he tries to keep all sales within the same economic time period and tries to avoid using distress sales. He thinks distress sales have "stabilized a little bit" since the downturn.

31.     Mr. Parrish noted that, as a rule, the price per acre decreases as the size of the property goes up. He therefore made negative adjustments of 10%, 10%, and 5% on sales 1, 2, and 3 in his report for size as compared to the subject. Appraisers make adjustments to comparable sales to make the comparables as "similar as possible as possible to the subject property."

32.     Mr. Parrish testified that the property was unique. In his opinion, it would not be feasible to subdivide or "tract up" the property due to the location of the house. He opined that the highest and best use of the property was for agricultural and residential use. *See* Exhibit 13. p. 29.

33.     He testified that his adjustments to the comparable sales were minimal and that the sales he selected were the three most comparable sales. He had a range of values from $8,500 per acre to $10,500 per acre.  He chose $9,000 per acre as the value of the subject property.

34.     Mr. Parrish noted the house had been extensively renovated and remodeled. He valued the house using the cost approach based on the *Marshall and Swift Residential Cost Handbook* (Hereinafter *Marshall and Swift*).  He arrived at a depreciated cost for the residence of $684,543.51.  *See* Exhibit 13, pp. 40-41.  The value he assigned to the house itself was less than the cost of construction. The remodeling had added square footage and updated quality and condition making it "as nice as you can do." The remodeling changed the effective age of the house so that it was effectively five years old even thought built in 1988.  Mr. Parrish used an "age-life" method. He depreciated the driveway more than the house itself.

35.     Mr. Parrish's opinion as to the total depreciated value of the improvements was $684,543.51 and the land value $312,750, for a total of $997,293.51 in the before condition. *See* Exhibit 13. at p. 41.

36.     He valued the land taken for the easements at $20,169.   He evaluated the easement at ninety percent (90%) of fee value.  *See* Exhibit 13. p. 43.  Mr. Parrish found a diminution in value to the remainder of the property, outside of the area of the easement, of seven and one-half percent (7.5%)  *Id.*, p. 44.  He thus opined that the total damages to the remainder were $73,284.34 and total damages to be awarded to the landowner were $93,453.34, which he rounded up to $93,500.00.  *Id.,* p. 4.

37.     In support of his opinion on incidental damages to the remainder, Mr. Parrish noted that there is no place looking south from the house from which one cannot see the power line. View is an especially important factor for the property.  He opined that any trees planted to

cure loss of view might have to be cut down as being a danger to the lines and that there was no cure to loss of view from the lines. He opined that all other things else being equal property with an easement will not sell for the same price as property without such an easement. He opined that in the area around the property median home value is expected to increase in the future.

38.     Mr. Parrish cited further factors in his assessment of incidental damages such as the loss of use of the easement area, unsightliness, inconvenience, impairment of access, guy wires generally, and the view to the southwest and west of the house.

39.     On cross examination, Mr. Parrish testified that he did not adjust his comparable sales for economic trends, because the downturn occurred before the sales. He said his sales were in the same economic conditions as the date of take. He indicated that the approximately four acres of the property in a flood plain did not affect highest and best use, since no one would build a house along the road frontage where the flood plain was located. Flood plains on comparable sales were not noted in the report.

40.     Mr. Parrish did not make an adjustment for size on any comparable sale, being of the opinion that all were similar to the subject. He did not compare road frontage per acre, because he believed that the shape of the subject gave more opportunity to show or see the property. He agreed that some comparable sales had more road frontage per acre than the subject property. He stated the road frontage in a flood plain on comparables was not relevant because he valued the subject as a whole. In looking at comparable sales, Mr. Parrish will ask a buyer or seller about the sale if he sees something that stands out about the sale possibly being wrong or not at arm's length.

41.     On the valuation of the house, Mr. Parrish testified that he used Marshall and Swift for cost data. He made this determination based on the market and not on what the

landowner had spent on the property. Mr. Parrish testified to an effective age of five years and an economic life of sixty years, yielding a depreciation of 8.33%. He indicated that this was because the house had been remodeled and was not in the same condition as when it had been originally constructed. He admitted that there was subjectivity in the determination, but noted that his economic life estimation was sixty years and TVA's expert, Mr. Standifer's, fifty-five years. He agreed that external obsolescence could come from overbuilding a house. He indicated he would not have considered external obsolescence unless he used reproduction cost as opposed to rebuilding cost. He checked other sales to see if he was in line with them with his cost approach.

42.     In further response to cross-examination questions about why he assigned the percentage of incidental damage that he did, Mr. Parrish testified that there were no studies comparing two identical pieces of property where one had a power line easement and the other did not. The 7.5% incidental damage figure was his opinion. He based his opinion on his years of experience and talking to other developers and buyers. He said there was no study that replicated this property's damages. The incidental damages come from obstruction of view. He indicated the cost to cure would not be a cure.

43.     On redirect examination, Mr. Parrish testified that he did not rely on the comparable sales he selected to test to see if his cost approach was in line with the market. He used sales from 2008 forward, because he believed that these were within the same economic trend. He thought he was conservative and in line with the market. He testified that depreciation does not always correlate with age. Mr. Parrish noted that his third comparable was one also used by Mr. Standifer. He testified that the Uniform Standards of Professional Appraisal Practice

("USPAP") require him to value the property as a whole and according to the property's highest and best use.

44.     In response to questions from the Commission, Mr. Parrish testified that 7.5% was the lowest incidental damage figure he had ever used.  This 7.5% was based on the view of the property that could not be cured and because the pole and lines were visible from anywhere on the property and from any direction. View is a major selling point for a property of this nature, that is, a smaller "estate-type" farm.

### MARTIN SHAW, TVA EXPERT ARBORIST

45.     TVA called Martin Shaw as an expert arborist. It was stipulated that he could express opinions as an expert consulting arborist. Mr. Shaw has had experience in developing tree planting plans to mitigate the visual impact of ball parks and skate parks, among other things.  His assignment in this case was to appraise the cost to cure by transplanting and establishing trees to replace trees lost to cutting for the power line, for the purpose of improving the site to its previous condition or better with regard to tree aesthetics and functions.

46.      Mr. Shaw endeavored to ascertain how the trees contributed to the appearance and aesthetic value of the land as a whole. He examined aerial photographs and photographs after the taking to ascertain the condition before the taking.  He measured the area of the tree canopy using a planimeter. He assessed the trees by looking at roots, the buttress of the trunk, the branches, and the leaves.  By using a percentage, he then made a qualitative assessment of the condition of the trees after the take to ascertain the condition of the trees before the taking.

47.     Mr. Shaw did not actually see the trees that were cut before they were cut. He considered aerial photographs of the property for his supplemental report, Exhibit 19. He made judgments about the health of trees based on the stumps, which a trained arborist is qualified to

do. He examined, for example, a cedar tree stump that he said showed decay, which would have in his opinion made it fall "within a couple of years." He stated that another tree had exposed roots and was being undermined. In general, Mr. Shaw was of the opinion that there were "a lot of problems" with the trees on the property.

48.     In order to further ascertain the functional and aesthetic benefits contributed by the trees, Mr. Shaw did testing and analysis of the easement site and the subject property based on soil samples, looking at trees near the site, stumps of cut trees, and surrounding characteristics. *See* Exhibit 18., pp. 15-18.

49.     To develop his remediation plan, Mr. Shaw testified that he was looking for "replacement trees." He opined the trees on the site before were "undesirable" based on a species rating guide from the International Society of Arboriculturists and that most of the cut trees "offered little in the form of ornamental aesthetic qualities." *See* Exhibit 18. pp. 22-23. He found that among the trees that had been cut, the hackberries and osage oranges, for example, "had little to offer" in the way of "landscape value." He testified that other trees that had been lost, box elder trees, drop limbs. Except for ash trees, he did not regard the trees he found on the site as merchantable ones that could even be purchased in a nursery.

50.     The purpose of Mr. Shaw's plan was to improve the aesthetics and functional properties of the trees like screening, livestock shelter, erosion control, noise control and wind control. *See* Ex. 18. p. 15. He determined tree size from the largest commonly available trees at local nurseries. He tried to get stately trees. He did not think the trees that were lost were stately trees. He wanted to install three and one-half inch (3 ½") diameter trees that were sixteen to twenty-two feet tall and which would not have bugs, mold or funguses. He opined that there was

little or no tree canopy between the landowner and her western neighbor before the date of taking, based on aerial photography done in winter, on March 3, 2006.

51.     The Supplemental Report, Exhibit 19, page four, shows the trees in the before condition consistent with the aerial photography. Mr. Shaw opined that screening from trees on the landowner's side of the property would be "very limited" and "sparse". He analyzed the trees in the before condition, the soil, and site characteristics.  He chose trees from those commonly available at local nurseries.  *See* Ex. 18, pp. 76--94.

52.     Mr. Shaw opined that the trees he selected for his plan remedied the loss of trees cut for the easement. He said the trees would never interfere with the power line. He indicated the total cost of cure was $34,469.40. *See* Ex. 19, p. 1. He opined that the trees in the cure would "in the future" create a design that would serve as a better screen. His method of curing the visual impact of the line was to change perspective and focal point with tree placement, size, shape, and colors.  *See* Ex. 18, pp. 68-70.

53.     On cross-examination, Mr. Shaw admitted that he was submitting a "cost to cure appraisal of the trees that were lost" and not a technical cost to cure from an appraisal standpoint. He was trying to give the landowner the functional and aesthetic value of the trees that were lost qualitatively.  He doesn't know how may stumps were ground or how many trees were cut. He agreed that the trees on the property benefitted the property in the before condition and provided the very qualities he was now attempting to cure, such as function and aesthetics, wildlife habitat, and erosion control.

54.     Mr. Shaw has not measured noise attenuation, but is of the opinion that the trees in the before condition would not have attenuated noise based on reports he has seen. He admitted that he did not know how many trees were there or their density. He had only the aerial

photograph to go by. He admitted that the trees before the take provided wind attenuation and that trees in a grove would be able to deal with wind in a better way and protect each other. The trees he proposes are out in the open. Mr. Shaw admitted that the trees he proposes are three and one-half inches (3 ½ ") in diameter and the trees that were lost were up to twenty-two inches (22 ") diameter and could have been fifty (50) years old.

55.     Mr. Shaw admitted that from the landowner's front porch the power pole can be seen and is around one hundred feet (100') tall. He made no measurements with regard to line of vision or line of sight. The remediation plan did not address erosion control. Mr. Shaw placed trees between the landowner and her neighbor. He is of the opinion that it is acceptable to plant elm trees over septic field lines.

56.     On redirect examination, Mr. Shaw opined that the trees were essentially the same all along the fence line. He performed a soil analysis to determine how trees would grow. He planted trees in groups as a general principle. Mr. Shaw was not able to say how long it would take the trees in the remediation plan to grow to a size that they would be comparable to the trees in the before condition, as far as providing screening. He was of the opinion that the new trees would be better at cooling.

57.     Mr. Shaw did not think that a complete screen or privacy screen from the line was necessary. He just wanted to "diminish the impact of the view" and asserted that the screening provided in his plan would be effective at eliminating visual impact. He did not think the trees placed on his plan would hurt the septic field line.

58.     On re-cross examination, Mr. Shaw conceded that he did not see most of the tree stumps and that the vast majority of the trees lost were not in the fence line. He admitted that he would need to see the picture of the tree in Ex. 8-B to tell if it had had anything wrong with it.

He conceded that the oak tree in the picture could be older than fifty (50) years. He admitted finally that he had proposed the planting of new trees as if the homeowner were trying to sell the property, not the field or open view.

59.     On questions from the Commission, Mr. Shaw testified that in his opinion the trees he would plant completely compensated for the loss the landowner incurred at the time they were planted without growth.  He admitted, however, that it could take fifteen (15) years for the trees to mature.

**GARY R. STANDIFER, TVA APPRAISAL EXPERT**

60.     Gary R. Standifer was allowed to testify and offer opinions as an appraisal expert without objection. He used the comparable sales method of valuing the easement and arrived at a value of $7,500 per acre. He inspected the property and looked at sales that were close in time to the taking in 2011. He looked at market trends in Sumner County.  Mr. Standifer was of the opinion that sales from the last quarter of 2008 were not appropriate comparables.

61.     Mr. Standifer noted that his sale No. 1 on Wright's Lane, which had sold for $8,813 per acre in February of 2011, was also used by Mr. Parrish in his report.  Mr. Standifer adjusted this sale downward to $7,500 per acre.  Mr. Standifer opined that the subject property was at the upper end of its neighborhood, but that it would be in the middle of the Wright's Lane neighborhood, as far as its value. He did not think the subject's road frontage was a benefit.

62.     Mr. Standifer relied on sales not in his report to justify the downward adjustment. These sales were closer in time to the date of taking, closer in distance, and smaller. The sales prices averaged $7,500 per acre. He testified that the Martin property, which Mr. Parrish also used as a comparable, was purchased at a premium due to the owner having other adjacent or nearby property.

63.     Mr. Standifer also used *Marshall and Swift* to arrive at a replacement cost for the house on the property. He made a depreciation estimate and determined the effective age was ten (10) years and the economic life was fifty-five (55) years. He noted the core structure was eighty-nine percent (89%) of the present square footage. This was the basis of his ten (10) year effective age.

64.     Mr. Standifer applied eighteen percent (18%) as a depreciation figure.  He valued the total improvements at $854,526. *See* Ex. 22, p. 20.  He was of the opinion there was a thirty percent (30%) depreciation in the house, due to bringing it in line with market conditions.  Mr. Standifer testified that some costs that had been incurred by the property owner would not likely be recognized in the value.  Ultimately, his opinion as to the depreciated value of improvements was $598,168.  Mr. Standifer valued the land at $260,125.  His opinion of total value of the property as of date of take was $860,000.

65.     Mr. Standifer testified that the damage to the land within the easement or right of way (2.49 acres), at ninety percent (90%) of fee value, was $16,808, based on a fee value of $18,675.  He found additional damage from guy wires on .01 acre of $100. He found finally that a 1.82 acre "somewhat isolated" remainder in the southwest corner of the property that he damaged at thirty percent (30%) for a damage to that portion of $4,200. He took into consideration flood encumbrance. Mr. Standifer considered Mr. Shaw's cost to cure the loss of trees which was $34,500.  His opinion as to the total compensation due to the property owner was $55,700.

66.     In evaluating whether there was damage to the remainder of the property, Mr. Standifer looked at the Somerset Downs development in Sumner County.  He determined that there were houses in that subdivision that had been built in proximity to power lines. He opined,

based on TVA data, that there was no harmful electromagnetic field health effects. Mr. Standifer also relied upon "matched pair" studies. He offered that "matched pair" studies do not have to be comparable in every respect. The Somerset Downs study was for sales from 2005 to 2008. He said the study showed there was not "a difference or a loss in value for the residences that were located adjacent to the power line easement versus residences of a similar size and sale date away from the power line easement."

67.     Mr. Standifer also looked at the sale of rural properties adjacent to power lines in the Bethlehem Road study. He relied upon the Stone Bridge Park study to evaluate partial tree screens. He opined that the studies show smaller properties are affected more damage wise than larger properties. He found no damages outside of the right of way in the present case. He said that studies show there is no damage when the line is five hundred feet away. He opined that a visibility effect diminishes from two hundred to three hundred feet in distance. He based this on the three studies referenced above.

68.     On cross-examination, Mr. Standifer admitted that he was not aware that in his comparable sale No.1 the owner was moving and had to liquidate. Nor was he aware that this comparable was burdened by an access easement to another property. Mr. Standifer did not know where the easement was located. He did not make an upward adjustment for that. On his sale No. 4, Mr. Standifer did not know that the seller had to sell the property because of his purchasing another house. He had not spoken to the seller. On sale No. 5 he was not aware the purchaser had earlier sold it to the owner for $8,863 per acre and that the property has no road frontage. He was not aware the owners, a family trust, had sold the property for half of what they paid for it because they could not pay for it. He had not spoken to the owners. If these facts were correct, Mr. Standifer admitted that the sale would be a suspect or distress sale.

69.     Mr. Standifer admitted that sale No. 2 is also burdened by a number of access easements. His sale No. 1 is a common one with Mr. Parrish's comparables. Mr. Standifer adjusted downward and Mr. Parrish adjusted upward. He agrees with Mr. Parrish that the highest and best use of the subject property is as one parcel.

70.     When asked about the Mansker's Farm study, Mr. Standifer admitted that the lots were less than one acre and within the Hendersonville city limits. He conceded that Study 5 is Veterans Park in Hendersonville, which has higher property values than in the area of the subject. He admitted that in Study 10, the easement area was used for access roads and parks, but that there were no houses. In the Bethlehem Road study, the lots with power line easements sold for less. Mr. Standifer did not inspect the interior of the homes in Somerset Downs to see if the builder had done upgrades to the houses close to the easements to help sell them.

71.     Mr. Standifer testified that he had assigned a higher effective age to the house because eighty-nine percent (89%) of the structure was within the original core area. He thought his ten (10) year effective age and Mr. Parrish's five (5) year effective age were both within USPAP standards.

72.     In Mr. Standifer's opinion, the cost of cure for the trees was an effort to "provide the amenities those trees provided" and "partial screening." The cost to cure the trees was an "effort to be fair to the landowner." He indicated external obsolescence was a judgment call based on factual data. He noted the drop off in sales in Sumner County in the last quarter of 2008. He noted the 1.82 acres was "somewhat isolated" by the power line. His cost of cure was for privacy and view, but he does not damage the remainder of the property. He stated, however, that "technically cost to cure is a damage and the 1.82 acres is a damage as well."

73. When asked about the *Appraisal Journal* article, page A-212 of Exhibit 26, Mr. Standifer noted that half the studies find negative property value that are generally less than ten percent (10%) and in the range of three (3%) to six percent (6%). He indicated that such negative effects dissipate from two hundred (200') to three hundred feet (300').

74. In response to questions from the Commission, Mr. Standifer stated that the total economic life was done first and then the external obsolescence was applied to account for a down market. He noted, "you can't sell the house for what it cost to build it." He stated, "cost new and fair market value are two different creatures." External depreciation was then subtracted from the cost new. He felt the Somerset Downs study was helpful because it showed houses being built backed up to the power line. He found no damages to the property other than replacing trees and the isolated part of 1.82 acres. He opined that lots in the Bethlehem Road study did not show a decrease in value once payment for the easement was accounted for.

75. On further re-cross examination, Mr. Standifer stated that, in his opinion, Lots 13 and 14 in the Bethlehem Road Study did not actually sell for less, because the owner would have been compensated for the easement. However, he was of the opinion that if the easement were on the lot, it would then be expected to sell for less.[2]

**LUTHER BRATTON, TVA APPRAISAL EXPERT**

76. Luther Bratton was called as a witness for TVA. His opinion was that the sale on Wright's Lane, Mr. Standifer's comparable sale No. 1, was superior to the subject property because of the flood plain on the subject, even though no flood insurance was required. He thought the sales price of property should be adjusted to $7,500 per acre because of the smaller

---

[2] TVA's counsel noted in a motion for clarification, which was granted, that the "studies" volume is exhibit 24 with page numbers starting with "S-" and the addenda volume is exhibit 23 and page numbers begin with "A-".

sales in the neighborhood.  Mr. Bratton did not prepare  a report but participated in and relied on the Standifer Report.

77.     Mr. Bratton testified that fifty-five (55) years was the appropriate economic life for the house, but could not say another number was incorrect. He indicated there were no sales of houses over 5,000 square feet in size in 2011 within ten (10) miles of the subject. He noted an economic decline in sales of houses over 5,000 square feet in size. He thought you would have to subtract land cost to get a price per square foot for a house. He opined that the per square foot cost of the house itself indicated there needed to be an external obsolescence factor. He determined by looking at other similar houses, not comparables sales, that the value of the house was $95 per square foot because of external obsolescence. This opinion was based partly on Exhibit 17, which was a sale of another house only on Wright's Lane, not the land sale used by both appraisers as a comparable sale.

78.     Mr. Bratton opined that the total value of the property before the take was $860,000. He is of the opinion that people locate houses next to power lines in Sumner County. He concurs with the other appraisers' assessment of ninety percent (90%) damages within the easement. He opined the Somerset Downs study showed people would purchase homes next to a right of way and that they did not pay less. He found no diminution of value in that study for the houses. He opined the land in the subject outside the right of way was not adversely affected by the taking, other than the triangular isolated remainder, and that just compensation to the property owner was $55,700.

## ANALYSIS AND DISCUSSION

79.     The appropriate amount of damages due to a landowner in a TVA case is the

difference between the fair market value of the whole tract before and after the taking. *See United States of America ex rel. TVA v. Easements and Rights of Way over 6 Acres of Land*, 117 Fed. Appx. 422 (6th Cir. 2004) *citing United States of America v. 2847.58 Acres of Land,* 529 F.2d 682, 686 (6th Cir. 1976).

80.     In this case, the Commission believes the assessment of value issue has two parts, using the method allowed in the *Instructions to Commissioners*, 61 F.R.D. 503: assessing the damage to the land covered by the easement itself and adding incidental damages, if any.

81.     Below is a table summarizing the opinions of the property owner and the expert appraisers:

| Appraisers/ Landowner | Lorance Landowner | Parrish | Standifer | Bratton |
|---|---|---|---|---|
| Highest and best use | Residential | Agricultural/ Residential | Residential/ Agricultural | Residential/ Agricultural |
| Value per acre | 10,000/acre | 9,000/acre | 7,500/acre | 7,500/acre |
| House val. | 800,000 | 684,543 | 598,168 | 598,168 |
| Overall value of house/prop. | 1,147,500 | 997,294 | 860,000 | 860,000 |
| Percent of damage | 90%/easement/ 10% remainder | 90%/easement 7.5%/ remainder | 90%/easement Guys/75/.3x1.82 acre/ Cost of cure $34,469 | 90%/easement |
| Damage to easement | 22,410 | 20,169 | 16,807.50 | |

| Incidental damage | 112,509 | 73,284.34/ remainder | Guys-75; 1.82 acre cut off-4,095;COC-34,469.40[3] | 1.82 acre cut off 4,095;COC-34,469 |
|---|---|---|---|---|
| Property as a whole | | | | |
| Amount due owner | 134,919 | 93,500/rnded. | 55,446.90 | 55,700 |

82.     On the total amount due the landowner the witnesses ranged from $55,446.90 to $134,919.  The property owner testified to total damages of $134,919.  Mr. Parrish found overall damage of $93,500, Mr. Standifer $55,446.90 and Mr. Bratton $55,700. The differences involved the underlying value of the property, including the improvements, and the existence and extent of incidental damages.

83.     All appraisal experts used the sales comparison approach to valuation of the property. "[C]omparability is a function of three variables: the respective characteristics of the properties, their geographic proximity to each other, and the closeness in time of the sales." *See United States v. 68.94 Acres of Land, 918 F.3d 389, 399 (3d Cir. 1990)* 918 F.2d 389, 399 (3d Cir 1990).

84.     The Commission notes that the Witucki to Helms sale ***on 1498 Wrights Lane, in which 22.98 acres sold February 15, 2011 for $199,000, or $8,813 per acre was cited and

---

[3] The $34,469.40 figure is the cost to cure the loss of trees based on Marty Shaw's (arborist) opinion. See, Exhibits 18. and 19. This is the cost of the trees in his design.

relied upon by all appraisers. In the opinion of the Commission, this sale comes closest to meeting the requirements for comparability.

85.     The Wright's Lane sale is 1.58 miles from the subject, occurred approximately one and one-half (1 and ½) months before the taking and comprises 22.58 acres, a size similar to the subject. The zoning is the same as the subject. The physical characteristics are similar to the subject, as it is described as "rolling". This comparable sale has the same utilities, but less road frontage, i.e., three hundred twenty-two feet (322') as opposed to one thousand eighty feet (1,080') for the subject.

86.     The Commission was persuaded by Mr. Parrish's testimony on the issue of the value of the land. Mr. Parrish assessed a basic value of the land in question of $9,000.00 per acre. The Commission credits that value based on Mr. Parrish's reliance on the Witucki to Helms sale noted above as the most comparable sale and the general cogency of his opinion. All appraisers agree that the evaluation of the land within the easement should be damaged at 90% of fee value.

87.     The Commission is not required to accept either the high or low testimony, but may form its own judgment as to the total loss occasioned by the take. The Commission must be realistic and make its judgment as to what testimony is realistic. *See U.S. ex rel. TVA v. Easement in Logan County, Kentucky*, 336 F.2d 76, 80 (6th Cir. 1964), on remand 246 F. Supp. 263, aff'd 375 F.2d 120 (6th Cir. 1967). Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent may be disregarded. *See Instructions to Commissioners*, 61 F.R.D. 503, at 507-508. The fair market value for the highest and best use of the property is the generally accepted standard for determining "just compensation" if the

property is taken by condemnation. *See United States v. 1,291.83 Acres of Land*, 411 F.2d 1981 (6th Cir. 1979).

88.     The Commission turns next to the issue of incidental damages.  As a preliminary matter, the Commission notes that the property owner filed a motion in limine seeking to exclude studies relied upon by Mr. Standifer.  However, at the start of the hearing, the parties agreed that rather than excluding the testimony altogether, the issue would need to be addressed through cross examination.  Based on Mr. Standifer's testimony and the extensive cross-examination to which he was subjected, the Commission rules that there was no basis to exclude his studies and overruled the property owner's motion.

89.     Generally a district court's decision to admit or not admit expert opinion and reports is reviewed on an abuse of discretion standard. *See General Electric Co. v. Joiner*, 522 U.S. 136, 138, 118 S.Ct. 512 (1997).   *General Electric v. Joiner* was a jury case. "The gatekeeper doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial." *See Deal v. Hamilton County Board of Education*, 392 F.3d 840, 852 (6th Cir. 2004).

90.     The Commission consists of experienced attorneys who are familiar with expert testimony and its uses and abuses. The Commission has heard these very experts testify many times and has read and re-read the various expert reports and studies in this case. As a general proposition the Commission gives more weight to the actual comparable sales analysis and particulars of the property in question than to academic studies.  As a general rule, and here, the Commission lets the impact of the studies go to the weight given to them, rather than serve as a basis for accepting or rejecting outright a given expert's opinion.   Accordingly, the motion to exclude Mr. Standifer's testimony is **DENIED.**

91.     Any award of damages for loss of value is to be based on the fair and reasonable value of the property as a whole. *See Instructions to Commissioners*, 61 F.R.D. 503, 514 citing *United States v. Myer*, 113 F.2d 387 (7th Cir. 1939), cert. denied, 311 U.S. 706, 61 S.Ct. 174, 85 L.Ed. 459 (1940).   Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent, may be disregarded. *Id.* at 507-508.   The Commission does agree that as a rule there is damage from the public apprehension of power lines as noted in *Hicks, supra*.   Likewise the Commission may consider as damage the unsightliness of towers and transmission lines in the locality as well as changes in the character of the ground which arises from such clearing. *See U.S. v. Robertson*, 354 F.2d 877, 880-81 (5th Cir. 1966).   *See also Easement in Logan County, supra*.

92.     The landowner had the burden of proving the fair market value of the condemned land. *United States ex rel. and for Use of T.V.A. v. Powelson, 319 U.S. 266, 273, 63 S.Ct. 1047, 87 L.Ed. 1390, 1396-1397 (1943); United States v. 1291.83 Acres of Land, 411 F.2d 1081, 1084 (6th Cir. 1969).*

93.     The Commission participates in a view for a reason. The reason is to "enable them (Commissioners) to better understand and weigh testimony which they hear." The Commission may 'take into consideration what you (Commissioners) will see on the view; and you will base your awards on both the view and the testimony you will hear." *See Instructions*, p. 3. The Commission was able to see at the view the affect of the loss of trees and the view of the power lines, the extensive road frontage, the area that was considered in a flood plain, the cutoff 1.82 acre area, and the existence of guy wires outside the easement and other factors.   The Commission is of the opinion that there was some incidental damage to the property due to the location of the lines and poles thereon.

94.     A landowner's testimony as to the value of his property is not always sufficient testimony on which a verdict can be based.  There must be a basis for the landowner's valuation, and when the landowner's own testimony shows that her valuation has no probative value, the court may determine that the landowner's testimony alone is insufficient to support a jury verdict. *Sowards,* 370 F.2d at 92 ("[W]here the presumption of the owner's special knowledge is negated by his own testimony, his opinion has no probative value and is insufficient to sustain the award."); *see also Kestenbaum,* 514 F.2d at 698-99; *Klapmeier v. Telecheck International, Inc.,* 482 F.2d 247, 253 (8th Cir.1973). A landowner's opinion must have probative value and have a relationship to market value. *United States v. 901.89 Acres of Land*, 436 F.2d 395, 399-400 ( 6th Cir., 1970) *citing United States v. Trout*, 386 F.2d 216, 223, n. 10 ( 5th Cir. 1967). Here, the landowner's testimony as to damages to land value was not consistent with the damages found by the various appraisers.  While the landowner's testimony has weight as noted in the *Instructions*, the Commission is not required to accept it. The landowner relied on no comparable sales or other market information or special knowledge or expertise in real estate to substantiateg her opinion.  Hence the Commission cannot credit that portion of the landowner's testimony that was completely inconsistent with the appraisers' testimony.

95.     For the value of the house the Commission credits Mr. Parrish's value of $684,543.51.   The Commission was persuaded by his opinion and also by its own inspection of the house that Mr. Parrish's testimony as to the effective age of the improvements and their remaining useful life was fairer and more reasonable than that of TVA's appraisal experts.

96.     Mr. Parrish found that the total damages to the remainder were seven and one-half percent (7.5%) of the value of the property, or $73,284.34.   Mr. Parrish testified that there were no studies comparing two identical pieces of property where one had a power line easement and

the other did not. He based his opinion on his years of experience and talking to other developers and buyers. He said there was no study that replicated this property's damages. The incidental damages come from obstruction of view.

97. Both of TVA's appraisal experts relied upon a so-called "paired sales analysis" to support their opinions that there was no damage to the remainder simply by virtue of the location of the power lines and pole. Paired sales analysis has been defined as "the data derived from comparable properties sold twice within the period of research." Paired sales analysis is a tool for determining value before and after the construction of a public improvement that may be damaging to the property. *See Tax Increment Financing Commission of Kansas City, Missouri v. Romine*, 987 S.W. 2d 484, 489 (Mo. Ct. App, 1999), citing *Elam v. Alcolac, Inc.,* 765 S.W.2d 42, 218 (Mo.App. W.D.1988). Paired sales analysis pairs comparable properties in order to value a point of difference. For example, to decide if the presence of a gravel pit would affect value, a property in the neighborhood of a pit is compared to a similar property without such an influence." *See Shelley Materials v. Daniels*, 2003 WL 77176 (Ohio. App. 2 Dist.) Slip op. at 11. An appraiser "perform(s) a detailed paired sales analysis by selecting property near external structures such as water towers, power lines or cellular towers, and property which was not, adjusting for any other differences in the pair of properties, and comparing the two types of property in order to measure the effect of the structure on real estate values." *See Cellular Telephone Company v. Zoning Board of Adjustment of the Borough of Ho-Ho-Kus*, 24 F. Supp. 2d 359, 371 (D. New Jersey, 1998).

98. On page 42 of Mr. Standifer's report, Exhibit 22, he cites an article from the *Appraisal Journal* [4], quoting the following portion:

---

[4] Chalmers and Voorvart, "High Voltage Transmission Lines: Proximity, Visibility, and Encumbrance Effects," *Appraisal Journal*, Summer 2009, p. 227, cited at Exhibit 22, Standifer Report, pp. 40-41.

Over time, there is a consistent pattern with about half of the studies finding negative property value effects and half finding none.

When effects have been found, they tend to be small; almost always less than 10%-6%. and usually in the range of 3%-6%.

Where effects have been found, they decay rapidly as distance to the lines increases and usually disappear at about 200 feet to 300 feet (61 meters to 91 meters).

Two studies investigating the behavior of the effect over time find that, where there are effects, they tended to dissipate over time.

There does not appear to have been any change in the reaction of markets to high-voltage transmission line proximity after the results of two widely publicized Swedish health-effects studies were preliminarily released in 1992.

These general conclusions have characterized the appraisal and economic literature throughout the last twenty-five years, and there do not appear to be any new or different trends in research.

99.    The Commission has carefully considered the paired sales analyses relied upon by Mr. Standifer in this case, but finds that they either deal with properties that are not comparable to the subject or have analytical flaws.[5]    Ultimately, the question in this case and every is not whether power lines and structures tend to damage residential value generally in higher density suburban developments, but whether the lines have diminished the value of the property in the

---

[5]    The Commission notes that the Somerset Downs Study (Study 2) concerns "an upscale subdivision north of Hendersonville." It is difficult for the Commission to see how exactly this compares with a thirty-five acre residential/agricultural property in the country several miles north and west of Gallatin.  With regard to the residential study on Bethlehem Road (Study 3), Mr. Standifer has chosen to not consider the encumbered area in his price per acre. He used a concept of "unencumbered acres" as if the lower price per acre paid for more acres did not matter. But, it does.  As Mr. Standifer's table indicates, the average price per acre of the encumbered lots is $4,195.27 per acre and the lots are larger, averaging 6.555 acres as opposed to the unencumbered lots average of 5.01 acres and a price of $4,970 per acre. Clearly, from his study, the power line encumbered lots are larger and sell for less per acre. The loss in price is, on average, $774.73 per acre or a percentage decrease of 15.58%.  The one so-called "view lot", Lot 12,  is the same price per acre as unencumbered lot,s but has a substantial number of trees and is  not close to a tower which is two lots away. The Commission does not  accept the concept of "unencumbered acre" that Mr. Standifer postulates, because it ignores the plain fact that the developer had to sell more land for less per acre to get the same amount, $25,000, per lot as for unencumbered lots. Even under Mr. Standifer's description the view lot sale is at the edge of what the *Appraisal Journal* article sets as the outer limits of negative value effects. With regard to studies number 1., 4., 5., 6., 7., and 8 it appears to the Commission that they have less relevance to the subject property and were not relied on by Mr. Standifer in his testimony. He mentioned a Stone Bridge study but there is no study in his materials by that name. For these reasons the Commission gives Mr. Standifer's residential studies less weight.

case before the Commission. Moreover, it is apparent that TVA's appraisers implicitly find that there is damage to the remainder, because they proposed remediation plans to cure the damage. This undermines the position taken by TVA that there is no damage at all.

100. To summarize, for the damage to the easement itself the Commission accepts the opinion of all appraisers of ninety percent (90)% damage to the exact land covered by the easement itself. A landowner's testimony as to the value of his property is not always sufficient testimony on which a verdict can be based. It is not acceptable for the landowner to show "that his plans have been frustrated by the taking of his property, or what the land was worth to him, because these are all matters which are personal to the owner and do not have a bearing on the market value of the property or the compensation to which the owner is entitled." See, *Instructions*, p. 4. There must be a basis for the landowner's valuation, and when the landowner's own testimony shows that her valuation has no probative value, the court may determine that the landowner's testimony alone is insufficient to support a jury verdict. *Sowards,* 370 F.2d at 92 ("[W]here the presumption of the owner's special knowledge is negated by his own testimony, his opinion has no probative value and is insufficient to sustain the award."); *see also Kestenbaum,* 514 F.2d at 698-99; *Klapmeier v. Telecheck International, Inc.,* 482 F.2d 247, 253 (8th Cir.1973). A landowner's opinion must have probative value and have a relationship to market value. See, *United States v. 901.89 Acres of Land*, 436 F.2d 395, 399-400 ( 6th Cir., 1970) citing *United States v. Trout*, 386 F.2d 216, 223, n. 10,( 5th Cir. 1967). Here, the landowner's testimony as to damages to land value was not consistent with the damages found by the various appraisers. While the landowner's testimony has weight as noted in the Instructions, the Commission is not required to accept it. The Landowner relied on no comparable sales. Hence the Commission cannot credit that portion of the landowner's testimony.The Commission is then

confronted with the issue of the amount of damages to the property. The Commission's award of loss of value, however, is to be for the fair and reasonable value of the property as a whole. See, *Instructions to Commissioners*, 61 F.R.D. 503, 514 citing *United States v. Myer*, 113 F.2d 387 (7th Cir. 1939), cert. denied, 311 U.S. 706, 61 S.Ct. 174, 85 L.Ed. 459 (1940). Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent, may be disregarded. See, *Instructions to Commissioners*, 61 F.R.D. 503, at 507-508. The Commission does agree that there is damage from the public apprehension of power lines as noted in *Hicks, supra*. Likewise the Commission may consider as damage the unsightliness of towers and transmission lines in the locality as well as changes in the character of the ground which arises from such clearing. See, *U.S. v. Robertson*, 354 F.2d 877, 880-81 (5th Cir. 1966). The Commission credits that value based on the Witucki to Helms sale noted above as the most comparable sale. The Commission is not required to accept either the high or low testimony but may form its own judgment as to the total loss occasioned by the take. The Commission must be realistic and make its judgment as to what testimony is realistic. See, *U.S. ex rel. TVA v. Easement in Logan County, Kentucky*, 336 F.2d 76, 80 (6th Cir. 1964), on remand 246 F. Supp. 263, aff'd 375 F.2d 120 (6th Cir. 1967). Testimony which is unreasonable and would, to the Commission's own knowledge, be inconsistent may be disregarded. See, *Instructions to Commissioners*, 61 F.R.D. 503, at 507-508. of $9,000 per acre, as found by Mr. Parrish, this yields $20,169 damage to the easement.

101. On the issue of damage to the property outside the easement area or incidental damages, Mr. Parrish has assessed incidental damages of 7.5% to the remainder as a whole for total incidental damages of $73,284.34. Mr. Standifer has assessed damages to the remainder of $38,639.40, which includes cost to cure damages of $34,469.40 from loss of trees, $4,095 to the

cut of 1.82 acres and $75 for the guy wires. Mr. Parrish's opinion as to damages, expressed as a percentage, comes to 9.375%. Mr. Standifer's opinion, expressed as a percentage comes to 6.456%. Both Mr. Parrish's and Mr. Standifer's percentages of value are within the range suggested by the *Appraisal Journal* article which is three (3%) to six (6%) percent generally with an outside limit of ten (10%) percent.

102.    The size, scope and visual impact of this power line, as observed at the view, as documented by the photographs in evidence and as explained and described by the witnesses, is significant. That significance is amplified by the fact that the easement is at the corner and west side of the property and is visible from the roads and all the property, as observed at the view.

103.    The Commission relies generally on guidance from the case law that there may be a diminution of value to the property based on "apprehension of injuries to person or property by the presence of power lines on the property (which) is based on practical experience and may be taken into consideration in so far as the lines and towers affect the market value of the land." *See Hicks v. United States for the use of the Tennessee Valley Authority*, 266 F.2d 515, 520 (6th Cir. 1959). All appraisers and landowners in this case agreed that the new easement affected the value of the property.

104.    Based upon all of the evidence produced at the hearing on this matter, aided by personal examination of the property in the presence of the parties and their attorney, the Commission is of the opinion that the calculation of damages, as of the date of taking, is as follows:

| | |
|---|---|
| Damages to the area of the easement itself | $20,169.00 |
| Incidental damages to the area outside the easement | $58,493.01. |
| Total damages | $78,662.01. |

105.    The Commission is also bound by the required action of the Agreed Order at Docket No. 29, which requires the addition of $6,500 to the just compensation award.  Hence, the Commission respectfully reports that the just compensation due the landowner(s) is $85,162.01.

Respectfully Submitted,


/s/ Jack W. Derryberry, Jr.
Chairman

/s/ Horace Johns
Commissioner

/s/ Douglas Berry
Commissioner